Number 142692. And we'll hear first from Mr. Hall. Good morning. May it please the court. This case is here really on two very different aspects. The first is what the case began as a breach of contract action where summary judgment was granted against Mr. Burford on the basis that the agreement he'd entered into with accounting practice sales was terminable at will as a matter of law as it had an automatic renewal provision and the district court found that it could only be terminated in the event of a material breach by Mr. Burford that's under Illinois law making it terminable at will. The second aspect arose from counterclaims that accounting practice sales had filed against Mr. Burford based in the first event on a Lanham Act claim of unfair competition alleging that Mr. Burford, following the termination of his agreement with accounting practice sales, engaged in a pattern of unfair competition and a scheme to deceive and defraud the public by the use of the name American Accounting Practice Sales. Following the entry of summary judgment on the breach of contract claim, accounting practice sales first moved to voluntarily dismiss the counterclaims against Mr. Burford. When that was subjected to, they did then move to dismiss them with prejudice and as a result of that Mr. Burford then sought an award of attorney's fees as a prevailing party on the Lanham Act claims. And I'd like to start there if I could. In this court's decision in the Nightingale v. Anodyne case, the Seventh explained and set out what they saw as the basis for attorney's fee awards in Lanham Act claims and what a prevailing party has to show. And we believe that Mr. Burford has shown that the pursuit of this claim by accounting practice sales was objectively unreasonable based on the fact that they really never had any evidence to support their claims. Do you agree that that decision is subject to review for abuse of discretion? Correct. And recognizing that it is a high standard. So when are fees mandatory? When are they mandatory? That's what you're arguing here, right? Well, I guess it would be mandatory if a litigant, a prevailing party has shown that the claim was objectively unreasonable. I think what we have to show this court is that the district court decision that the pursuit of those claims was reasonable was in abuse of discretion. So we have to clearly show to this court that those claims were objectively unreasonable. And I think if that's shown and they are, you know, I don't know if mandatory is the term I would choose, but I think if that's shown and this court has made clear that those fees are to be awarded. The evidence that the district court relied on in finding the landmark claims reasonable consisted of basically a series of internet searches performed by counsel for APS just before they filed a summary to Mr. Burford. What was the name that your client was using? American Accounting Practice Sales. It's pretty close, isn't it? It is, but I mean, his position was that accounting practice sales basically tells what they do. I mean, he likened it to a situation where you've got, somebody sets up automobile sales and he sets up a street calling it American Automobile Sales. It differentiates what he was doing and he also indicated that he had called his American because accounting practice sales was not just an American, but they were a worldwide operation. But he opened that company the same day that he was terminated, right? Correct. And it was using, and it was the same business, right? It was essentially the same business. American Accounting Practice Sales that Mr. Burford operated basically did the same thing that Mr. Burford had done when he was under the agreement with accounting practice sales. American Accounting Practice Sales and accounting practice sales are not totally in the same business because accounting practice sales basically assists brokers in obtaining listings and provides them a system or methodology that they believe helps them to close sales and find and match up buyers and sellers. Whereas Mr. Burford didn't, he didn't have agreements with other brokers like accounting practice sales did where he wasn't operating as an umbrella for brokers. He was basically brokering the same as he had done under the accounting practice sales umbrella. Mr. Hall, let me ask you about your termination of contract claim. What did Plaintiff's damages look like on that claim given the rather, the sales records that we see for the last couple of years before the termination of the contract? Well, his damages are actually rather substantial under that because his income dropped off dramatically after he was terminated by accounting practice sales. His income in the year, actually the year before he was terminated was probably his best year of accounting practice sales and his income subsequent to that dropped off dramatically. Well, with the notice that defendants sent, 2008 they've got him at $82,000, 2009 zero, 2010 and 2011 just under $150,000 each, which according to the defense is way below what it should have been, right? Correct. Well, and especially in the earlier years, 2008, 2009 and 2010, his sales production had been very low, but in actually I believe in 2011 was the year that he had much higher production. And that gets into one of the issues where he just disputes not only the base of the termination, but whether there was a basis in the contract other than a material breach. Well, I assume you agree that poor production would be a ground for termination. Correct. And under the agreement, it does set out that minimum. Let me ask you about this question of terminability, okay? If I read the contract up to the very last sentence, I tend to agree with the district court this all looks indefinite, and therefore it would be terminable at will. The last sentence, APS defendant cannot terminate this agreement unless it is violated by Burford. I was trying to think whether it would be possible to frame that intent more clearly. Obviously, it could have been framed more clearly, and, you know, in retrospect, it should have been framed more clearly. How? I don't see how it could have been, the intent to make this terminable only for cause. Well, our argument is that the agreement could be violated by Burford in a number of ways without being a material breach necessarily. I mean, initially the agreement sets out that they're going to provide Mr. Burford certain guidelines and methodology for operating his practice, you know, that they believe to be valuable in operating the business. It's our position that if he failed to follow those guidelines and procedures, that they might have a basis to terminate him because he's not following the guidelines and procedures that they promised to provide him when they entered into the agreement. The other thing, I believe it's paragraph 11 that discusses the minimum sales requirements or the minimum production, it's got a formula in there for calculation of that, and that was actually in the amended complaint one of the things that Mr. Burford had complained about was that he hadn't ever been provided a clear explanation of what formula or what calculations they had used to determine that he had not met his minimum production standards for each of the territories that he had been assigned. But the minimum production requirements wasn't written into the contract as a cause for termination. Isn't that correct? I believe that it is because it says that his territory cannot be reassigned unless he fails to meet these production standards. Right, so they could reassign his territory to somebody else. Right, which terminates his contract. I mean, once he's assigned this exclusive sales territory, if it's reassigned to someone else, he's terminated. Well, is it that they would reassign all his territory or just certain regions of his territory? Because by the time he got to where he was, he was actually responsible for more states in Louisiana. Correct, but if they're able to reassign all of his territories, whether it's, as the party said, some dispute as to whether it was one territory or multiple territories, but if they can assign all of it either as one territory or they can assign all of it as five separate territories because he failed to meet the standards in each of those five territories. They did, in fact, reassign all of his territories, correct? Correct. And this memo from January 15, 2012 contemplates an end to the relationship. Correct, and that's where I was heading. When he was terminated, the email that sent that out said, you know, we're reassigning all of your territories and here's, you know, they did in that email reference the poor production, but Mr. Burford in the amended complaint said that he had never been provided an explanation or a thorough calculation of how that was determined for each of the territories. And that was, you know, one of the disputes between the parties was whether it said that minimum production applied to the territory as a whole or to each individual state. Mr. Hall, let me ask you about Illinois law as you understand it. Do you understand Illinois law to prohibit indefinite contracts that are terminable only for cause or simply to require a clear statement that that's the party's intent, that it be terminable only for cause? My understanding of the law is that if that is the only thing in the contract, then it prohibits a perpetual contract unless there's some other objective. Are you familiar with employment contracts, for example, that provide that they are terminable only for cause? Correct. Whether you're talking about civil service or union contracts or a football coach who gets a contract that he gets, he can only be terminated for cause, right? Right. So it's not prohibited. You just have to make clear that that's what you want, right? Right. But I think in a lot of those instances, those contracts are not, at least in many instances, they're not going to be automatically renewing, and that was... Civil service contracts? Those renew until you retire, right? Now, your fellow could leave any time he wanted, right? Right. He was recovering. But he would then be subject to a non-compete under the contract, right? Correct. So help us understand the economics of this deal, okay? As I understand it, this is a fairly new business. Burford joins it to develop these territories. It starts out with Louisiana and then adds other states, right? Correct. So he develops the territory, and he'd be vulnerable, right, to somebody exploiting him if he develops the territory and an APS terminates for no reason, right? Right. And that was, as alleged, a complaint. And on the other side, if he's developing that territory, taking advantage of what APS has taught him and their name and so on, he can't just leave and take all that goodwill with him and stop paying APS. He's subject to the non-compete, right? Correct. That's a basic kind of tradeoff here, right? Right. Okay. So turning to your argument on the franchise, that this was a franchise. Right. And that you wanted to amend the complaint post-summary judgment, were you aware that the defendants were going to be raising this argument, that this was an at-will contract during discovery? I believe the first time we became aware of that, there was in the defendants one of their sets of interrogatory answers. I believe that they had raised that. I do not remember the exact date of that. It wasn't raised in a motion dismissed, where you see a lot of these terminal at-will actions being resolved, and not in the answer complaint, but as a summary judgment later on. And so why didn't you move to amend at that point? It's before the close of discovery. You realize that they are going to be making this argument, and you think the way around that is to apply the Illinois franchise statute. Well, for a couple of reasons. First, when they raise that in the interrogatory answers, we don't know that that's necessarily going to find its way into a pleading or a motion, because not everything raised at one point in discovery makes its way into a pleading or a motion. The first thing it appeared in was the motion for summary judgment, when we did say that. Well, but it also appeared in the deposition in Mr. Holmes too, right? Correct. And that was before the close of discovery? Right. You know, I guess at that point we did not view it as they were violating, as really a Franchise Act violation as much as they were violating the contract as it was written. It was only when you make the claim under summary judgment that these provisions of the contract are basically void and unenforceable, you know, that we say, wait a minute, the Franchise Disclosure Act says that they're not void and unenforceable in this type of relationship. And we believe that it's, you know, it's clearly under the law. You realize you're in your rebuttal time, I mean. Thank you, Your Honor. But the statutes of the state underlie any contract, and so the district court should have at least considered, does the statute allow under these circumstances this type of, these type of provisions to, you know, they don't have to be stricken to make a terminal at will, they can be enforced. Why did you need to amend your complaint to make that argument? We don't think we did. And actually in our brief, we did not argue the amendment in a brief. We just focused on the fact that the agreement as it was written should have been enforced as written and not sort of through the amendment, but just considering that statute. Okay, thank you, Mr. Grady. Thank you. I'm sorry, Mr. Hall. Then Mr. Grady for defendant accounting practice sales. Good morning, and may it please the court. I have three main arguments for why the district court should be affirmed. The first is that the district court did not err in finding that the party's contract was terminable at will. The second is that the district court did not err in refusing to apply the Illinois Franchise Disclosure Act of the contract. And my third main argument is that the district court did not err in refusing to impose attorney's fees under the Lanham Act because APS's claim was objectively reasonable. It didn't even approach something that was an abusive process as it required. I'd like to first address the district court's entry of summary judgment on the ground that the contract was terminable at will. The contract was perpetual, and Mr. Burford does not disagree with that. So under Illinois law, we then move to the question of whether there were any objective events that could have resulted in the termination of the contract, and there were none. Now, Mr. Burford stretches and tries to find three. The first... You don't think you were entitled to terminate him for bad sales performance? We don't. I've never heard a manufacturer or upstream party make such an argument. Your Honor, the contract is very clear in that instance. It says at the very last sentence, as you pointed out, APS may not terminate the contract unless it is violated by Burford. As you said, it could not be clearer. Now, what that means is that under Jesperson, that is a material breach provision, and Jesperson says that a material breach provision is not an objective event which would create an automatic termination of the party's relationship. I don't think that's what it says. Jesperson's... I'm looking at the language that's at page, let's see, get the right... 1016 of the Northeast Second Reporter. An agreement without a fixed duration, but which provides that it is terminable only for cause or upon the occurrence of a specific event, is in one sense of indefinite duration, but is nonetheless terminable only upon the occurrence of the specified event and not at will. The sentence leaves a little to be desired, but this obviously provides it's terminable only for cause, right? Correct. Okay, so we've got a clear statement to that effect. When you say this, are you talking about Jesperson or are you talking about the contract? I'm talking about the contract here. APS cannot terminate this agreement unless it is violated by Burford. Correct. Okay. Now, I agreed with your position as I read through the contract until I get to that sentence, okay? In your statement, your position is that that sentence has a legal effect that is 180 degrees opposite from its plain meaning, right? You're saying that, in fact, APS can terminate, doesn't need a violation by Burford, but can terminate anytime it wants. That's an extraordinary position. Your Honor, it's a position that is by operation of Illinois law because of Illinois public policy. Do you think Illinois law prohibits this contract or just provides a rule of interpretation? I think that Illinois law takes this contract and makes it terminable at will. So if your question is, does Illinois law prohibit indefinite contracts that have no objective event, the answer is yes. That's not my question. My question is, does Illinois prohibit contracts that are terminable only for cause, that last until the parties either mutually agree to terminate it or one party has cause to terminate it? If I could take the first part of that question, Illinois law does prohibit contracts which last until one party decides to terminate it. What about employment contracts that are terminable only for cause? If those four cause terms are defined well, for example, in the Donahoe case, which counsel cites? Yes. How well do they have to be defined? So that it is an objective event. So it's a breach of the contract, right? Well, it doesn't have to be a breach of the contract. For example, a performance goal that is set forth in a sales representative contract where it says this contract will last until Mr. Smith fails to achieve $25,000 per year in sales. That was the Donahoe case. And that was a termination that was not for will but for cause because there was an objective event. But if you have some future undefined concept that an employee might not perform generally, Illinois law says that that is terminable at will. That's extraordinary. And I don't think that's how we have read Jesperson. Could you talk about the Baldwin Piano case? Yes. I'm surprised that wasn't cited. The Baldwin Piano case is very distinguishable from this case. In the Baldwin Piano case, Judge Easterbrook said that Jesperson does not extend to cases where there is no ongoing intimate relationship between the parties that is required. That went to the public policy behind Jesperson. Well, Baldwin Piano actually makes the point that, in essence, it's a clear statement rule. It's a what? A clear statement rule. We've got two public policies. One is freedom of contract, which may include the protection that somebody in Burford's position wants to be terminable only for cause because he's going to invest in the territory. And the other public policy is against having contracts that go on forever. And Judge Easterbrook's opinion for the entire court in Baldwin Piano explained that that's resolved, in essence, by requiring a clear statement that the contract will be terminable only for cause or not terminable unless it is breached. And I think that there's something in addition to that. I think the court in Baldwin Piano said that this is not a Jesperson-type case where the Illinois public policy is implicated because you're not forcing people in a contractual relationship to stay together forever. So you're saying that employment contracts are against public policy if they are terminable only for cause? And this is pretty close to an employment contract, right? Well, not exactly. No, Your Honor, because the employment contracts that I've seen that talk about for cause define what cause is. You think they have to? No, because I think that for cause is defined in the common law at this point in terms of we know what for cause is when we talk about an employment account. We talk about felonies or dishonesty or embezzlement or whatever. Or simple failure to perform up to expectations. That's right. But getting back to the Baldwin Piano case, this is a case in which this contract would have required or could potentially have required the parties to stay in an intimate relationship indefinitely. It did, yeah. And because of that indefinite relationship that was intimate, Jesperson says that that's contrary to public policy. No, the same argument, though, extends to employment, right? Employer-employee long-term intimate relationship. You've got a clear statement. Well, let me put it this way. How could you express an intent to make the contract terminable only for cause more clearly than this did? You would define what cause is. In other words, taking paragraph 11 of the contract. For example, Mr. Burford says that the minimum production. I'm reminded of the card game of hearts where you go for broke, right, where you try to get all the hearts and the queen of spades, right? And that's what you're saying here. I've never heard a party in the upstream position in this distribution situation argue we had no right to terminate this contract under the contract for cause. And yet that's what you're telling us. Well, Judge, it's the way it's written. In other words, if I could go back in time and rewrite this contract for my client, perhaps I would have written something different. But what the parties signed limited my client's rights substantially. No, what you're arguing is that they, in fact, gave him utter freedom to terminate at will. That's where you're going for broke. By operation of Illinois law, yes. By not defining his rights more clearly, you multiplied his rights to terminate to utter discretion, complete will, right? The intent of the parties caused that result, yes. The intent of the parties was to create a contract that could not be terminated unless Mr. Burford violated it. Right. And the intent of the parties, by operation of Illinois law, resulted in a contract that was terminable at will. And that's the ATN case in this court interpreted Jesperson. And ATN said that, and I'm quoting here, Jesperson held that, quote, a contract permitting one party to terminate based on a material breached by the other party is deemed terminable at will. And that's exactly what the last sentence says, when it says that it may not be terminated except for Mr. Burford's violation. Now, to try to avoid the result that Jesperson compels, Mr. Burford says that violated does not mean breached. It means something else. But it's pretty clear that that's not the case. The plain and ordinary meaning of violated is breached in this context. Turning to the second reason that Mr. Burford says that there's an objective cause, he tries to identify an objective event in the fact that my client revealed to Mr. Burford trade secrets and methods of how to broker an accounting practice successfully. And Mr. Burford says, well, if he had failed to perform in a way that met those procedures, met those methods, that that would have been a reason that he could be terminated. But nothing in the contract says that. It just simply requires APS to reveal its methods to him. It doesn't say that Mr. Burford has to follow them. But even if it did say that, it would still be a permissive and equivocal right of termination. And that gets to something else that Jesperson held. Jesperson held that if a right of termination is not mandatory, if it's not automatic, if it's permissive, then you have a non-objective event, something that does not fix the duration of the contract. Where do you get that out of Jesperson? Your Honor, it's actually at ‑‑ I only have the northeast site here, but it's at 1017. The only Supreme Court said, quote, a permissive and non-exclusive termination provision will not create a contract terminable for cause. It's the non-exclusive part. I mean, I've never heard of a mandatory termination provision. Those are surely extremely rare. Well, that's actually ‑‑ Even if we want to continue, even, for example, salesmen miss their quotas all the time, have lots of excuses for it, and they're not required. You don't have to terminate them for that, right? You don't unless it's the Donahoe case, because when the parties write a contract that says this contract terminates upon salesman's failure to sell $50,000 in a month, then it's automatic. Then it's not discretionary. The third argument that Mr. Burford makes for an objective event deals with this minimum yearly sales volume. And during your colloquy with Mr. Hall, I think it became clear that this is a right that APS had to reassign territory, but it was discretionary, and the territory could have reduced in the same way that it grew, which is piecemeal. But in fact, you terminate it entirely, right? That's correct. But nothing required that. It was a discretionary exercise. Sure. And so it is not the objective automatic event that is required under Illinois law. I'd like to turn now to the Franchise Act issues. Let's be clear that Mr. Burford's raised this issue of the Franchise Act 13 days before trial, four months after the close of discovery, and after the court had ruled on and the parties had briefed summary judgment. We relied on the pleadings as they existed in moving for summary judgment, and so did the district court in granting summary judgment, and it just came simply too late. Even if it had not come too late, Mr. Burford is arguing for the extraterritorial application of the Illinois Franchise Disclosure Act. None of his territory was in Illinois. I don't know how he expects to apply that act to sales territory outside of the state of Illinois. Is defendant based here? No, Texas. Why are we in Illinois? Well, Mr. Burford lives in Illinois. He filed suit in Williamson County and we were moved. Even if the Franchise Act could be applied extraterritorially and had been raised timely, Mr. Burford didn't pay a franchise fee. He owed nothing if he was not successful, and in our brief we cite cases holding that an optional or contingent franchise fee is not a franchise fee under the act. Finally, I'd like to turn to the Lanham Act issues. Now, the idea that APS had no evidence going into trial for its Lanham Act claim is just simply flat wrong. We did have evidence. First and foremost, we had the fact that Mr. Burford found value in the secondary meaning of accounting practice sales, and the reason we know he found value in it is that he took it the day after he opened his new business. Adding the word American to accounting practice sales does nothing to distinguish it at all. Mr. Burford testified in his deposition that he found value in the APS name, and that's because my client spent a lot of time and money developing the strength of its brand. It advertised in trade magazines. It advertised at conferences. It did online presences. It spent time and money doing this. So all of these things would have been testified to at trial by Gary Holmes, my client's principal, who testified to these things in his deposition. And in our interrogatory answers, we identified these things that would have gone to trial. Market studies and consumer research surveys are not required to state a claim or to prove a Lanham Act case. Why did we dismiss with prejudice? It's exactly what the district court said. We were 13 days before trial. We win summary judgment. We wanted to end the case. We were ready to move on. I think you told us in your brief the damages would have been minimal. Yes. Do we have some record information to that effect? Yeah, just the interrogatory answers. Okay. And those are in the record for us? Yes.  I mean, a prevailing claim on the Lanham Act at trial really the main value would have been the attorney's fees that we would have won at the Lanham Act hearing, and why do that? There is nothing about the way APS handled its Lanham Act claim that even comes close to an abusive process, which is what Nightingale says must happen. Now, to get there, to get that type of inquiry, you'd have to basically do a mini-trial on why APS decided to file its suit originally and why it decided to dismiss it. And that's what Nightingale says you shouldn't do. We shouldn't turn these post-claim motions for attorney's fees into an exposition of every fact that went into the decision to file. We had an objective basis for doing so. We pursued it. We disclosed the evidence we intended to introduce at trial in our interrogatory answers. There was an even summary judgment briefing, which was not decided because we dismissed it prior to the court's ruling. It would have been briefed? It would have been fully briefed. And really, but for the district court's decision, we would have gone to trial on the Lanham Act claim and also the state law claims that went along with it, including the Illinois Consumer Fraud Act. One quick question, Mr. Grady. In the notice that Mr. Holmes sent to Mr. Burford to terminate the contract, it talks about he's proposing a contract, a non-compete for three years. What was going on there? I think, Your Honor, that was a settlement negotiation, essentially. Just an offer? It was an offer to walk away and try to do things peaceably. By the way, Mr. Burford maintained a lien under the contract on all of his listings, and he kept the listings that he had when he started his new company. In other words, his business operations for himself continued on as if they had not been interrupted. So the idea that he was somehow impacted adversely by his disassociation with APS doesn't really work. He had the same listings, he was the same guy, he could have continued. If there are no further questions, I will conclude my argument. Thank you, Mr. Grady. Any rebuttal, Mr. Hall? How much time does Mr. Hall have? Thank you. Just a couple of quick points. First of all, on the Lanham Act, the damages, which they argued that the minimal damages were the basis for the dismissal, that ignores the damages that are available and the damages that they had sought under the Lanham Act. The damages they refer to are just what Mr. Burford had earned in that first year, but what they had sought was not only his profits, but also that they obtained an injunction to prevent him from using the name, that he destroy all advertising materials, they sought their own attorney's fees. So it's kind of misleading to say that, well, he didn't make much money, so we dismissed it because there weren't many damages recoverable. That completely ignores what they had sought in the Lanham Act matter. With regard to the Franchise Disclosure Act, 13 days before trial was not the first time that the Franchise Disclosure Act was raised. It was raised in our response to a summary judgment motion as a basis for upholding the contract. And again, the court touched on a couple of competing public policies with regard to these automatically renewing contracts. The Franchise Disclosure Act inserts another one where if the relationship fits under the statute and says that under these circumstances, essentially a perpetual contract is allowed. In fact, it would be expired. We're not asking for the extraterritorial application of the Franchise Disclosure Act here. We're just asking to enforce the contract terms that the parties agreed to. It's not a case where we're saying add new terms to this contract and make them apply in other states. We're just saying this contract was entered into in Illinois and here's an Illinois statute that says the terms that these parties agreed to are perfectly acceptable and it can be enforced and what the parties agreed to should be enforced. Unless there's any other questions. If not, thank you very much. Mr. Hall, thanks to both counsel. The case will be taken under advice.